Oh, no, I have Mr. O'Donnell. Yes, sir. Hopkins and Mr. Matheny. You're all here. Welcome, gentlemen. We've called your case, which has to do with the Public Service Commission, I know, and in Mississippi versus, well, the defendant is a public service commission. So we'll start with Mr. O'Donnell. Thank you, your honor. May it please the court. David O'Donnell on behalf of the plaintiffs and the putative class members who are Mississippi Power Company rate payers. This case involves the question of whether the plaintiffs and the putative class members received a full refund of a rate that was illegally charged and paid by the rate payers that the Mississippi Supreme Court in the Blanton case ordered be refunded immediately. That refund was made pursuant to his subsequent Public Service Commission order. The refunds that were eventually issued starting on November the 9th, 2015 through December 2015 did not include an interest rate that Mississippi law required under these circumstances. So it's our contention that the plaintiffs and the Mississippi rate payers did not receive a full refund of the amounts that they paid, which would include the time value of the money that they've lost through the illegal surcharge that was imposed through the Public Service Commission and the Mississippi Power Companies. You set a date that interests me. You say the first batch of refund checks went out on the 9th. In the FAQ it said they were going to go out on the 7th. I thought the record said they went out on the 6th. Are you confident with the record site that the first refund check was issued on the 9th? Well, Your Honor, I think the reason why there's a bit of a fuzz in the record on that point is that the FAQ is talking in terms of what they expected to do in the future. As far as what they did in reality, I'm really not quite sure what was done. Right, but the FAQ speaks of amounts, what's the exact language, over the entire refund period up to November 7th we begin issuing refunds. So was the FAQ just wrong as a factual premise in the end? I think the other statements by the Power Companies announcement showed November 9th as the expected start date for the issuance. If someone's reading the FAQ, they wouldn't have been able to calculate the actual interest amount because it's an internally inconsistent date. Or am I going off on something that's irrelevant? Well, I wouldn't call it irrelevant, Your Honor. Of course, we're dealing with the pleadings. This is the context of a Rule 12b6 motion. But I think the interest rates are probably calculated, is what I surmise, based on the November 7th end date. I guess maybe a step back before we even try to discuss what the accrual date is. What's the harm in the injury here? Is it that they didn't use the statutory method to calculate or that you were underpaid according to that method? We were underpaid according to that method and we did not. But how would a reasonable rate payer then ever know until at least getting the first refund check? That's precisely our point, Your Honor, is that the cause of action doesn't accrue on wrongful payment until the rate payer receives the check in the mail. Up until that point, we're dealing with pronouncements of expectation. I could not sue. I could not sue on behalf of a client for an expected injury. I would have to wait for the injury to occur before I would have a cause of action. And that's precisely what we're dealing with here. These are wrongful... And yet you aren't dating the time as of when they would have received the check and known. That hasn't been your primary argument. Well, our argument's been that we have to wait until discovery to determine when each and every plaintiff received their check in the mail. These checks were all issued in successive weeks. Why do you need discovery? I mean, your clients have the checks or received the checks and deposited them. Yes, sir. But discovery would tell us when the cause of action would accrue for each plaintiff. But you're telling me you don't know when the named plaintiffs received the checks? I think... Because it could potentially be if the checks were distributed, what, over about a month? Yes, sir. It could be that those dates could be important. That month could be where the... But your argument is for each one, it accrued when they individually received the check. Necessarily so. Yes, sir. Otherwise, it's just an expected injury in the future. But so remind me on the time, if someone got their check right away, those early November dates, when did you file the lawsuit? What date? November 21st. Right. So wouldn't those people on your theory, the early recipients be out of time? No, they would not be. And the reason being is that even though they were injured, they did not realize they were injured until an expert economist gave a report explaining the nature and extent of the injury. So if you took... But it's an actual injury, right? They then had the critical facts. They have the amount and money. They know what the statutory rate is. I know the district court didn't do any of this, but I guess I'm on the same line of questioning Judge Cost is. That November, December set of dates becomes very important if at that point, and we know, I think the record is conclusive, but disagree with me if you, if it's true that your expert was poised and waiting, was already watching the FAQ. So certainly there was an aggregate number of facts for those early recipients to have said, wait, this doesn't correspond to the rate. Right. If you look at the expert report and, you know, granted, the appellees argument, and they will argue this to you that we were aware through our expert, his report indicates allegedly that he accessed the FAQ, which finally revealed for the first time, the 9.5% interest rate. Didn't reveal whether it was compounded or not, but just said it would be a 9.5%. That does not cause, that is not the accrual date. Again, the accrual date or the injury date, I should say, is the date upon which they received the refund check. Now we, the reference to the expert's report. And you argued that to the district court? Yes. Yes, sir. We did. It's in the responses to the motions. But then why did the district court not try to ascertain when each person received it? Most of the briefing talks about date of issuance. There's very little that I could discern about date of receipt. Right. There's no, there's no evidence. Again, this is a rule 12B6 pleading issue at this point. And therefore it's nothing in the pleadings to reflect that other than, you know, just statements in the FAQ, which said we expect to start issuing starting November 9th through December the 4th. But your position is the statute doesn't start running until the export report is issued. The problem with that, let's say it just, no one was looking at it. And then 10 I've just, I've never seen a deadline like this as tolling statute limitations based on the expert report. And it would seemingly, it could go on forever until that report comes out. Yes, sir. But in this case, the tolling is approximately six months or so. Well, seven months. Right. But I mean, why would it matter if it took, if it took 10 years on your theory for an expert to figure out the problem, wouldn't tolling for 10 years be appropriate? Depends on the nature of the injury. In this case, I think that would probably be unreasonable. I couldn't take that position and sound reasonable to the court, but given the nature of the injury, the tolling principles that we look at, is this, is this, is the kind of injury that's at stake here, the kind of injury that a lay person could fully appreciate either at the time of injury or should have known through some form of diligence. If we say the statute started running when the check was received, I take it, that means some plaintiffs are going to be timely and some not in all likelihood. Right there. If we don't go to the bright line of the should have known when the expert reports issue, we instead go back to the date of injury as, as the date of accrual, then there would be a period of discovery to determine who's an appropriate member of the class and who is not. But the district court says August of 2015, and your primary argument to us has been August of 2016. And now we're talking about maybe November, December, but it's really important because November 21 is the key day. The only other, am I correct that the only other possible accrual date would be November 1st? Opposing counsel arguing that that's when the FAQ gets, and if that's a possibility, which would zero out all your class, could you give us your answer to why the FAQ cannot be the day that they had the critical facts enough to seek professional counsel. Right. November 1st FAQ is a statement of expectation. What's going to happen in the future? When am I going to get my check? How much is it going to be? But the date of injury is not until the date they received the check. Does the November 1 statement conflict with the commission ordered refund? In other words, let's say I'm reading the FAQ. And even if it does say 9.5%, because it's compounded, that's more aligned with Mississippi law. Are you making any argument that the reasonable person would think, well, that isn't what was approved. So we don't need to if the court's referring to the August 6 Kemper order, which required the refund. Yeah. The only statement that is in the Kemper refund order is the public's, the power company may use its weighted average cost of capital with no numerical assignment in the order. But I thought there was a footnote that referred to interest being done annually. I don't believe so. There's no reference, I don't believe, in the Kemper order that required interest to be calculated on a compounded annual basis. If that were the case, if you look at our expert's report, which is attached to the complaint, he outlines the finding, but based on what he could surmise, based on what he could discern from the public statements of the power company, that even using the 9.5% weighted average cost of capital, that the numbers don't add up. That either we apply the 8% legal interest or the 9.5%, and not even considering compounding interest, that the 29 or $30 million that the power company said it expected to pay in interest was clearly not sufficient. And it's not consistent with their stated interest rates. I'm just looking at record 166. I think this is the, I may be mistaken, but I think this is the refund plan approval footnote saying the carrying costs will be calculated using 2015 cost of capital adjusted for income taxes with annual compounding of interest. Well, I would state that the actual interest rate calculated by the power company did not jive with that. But that, therefore, that's my point. Therefore, the FAQ that someone puts up on the internet wouldn't be consistent with what was the actual approved plan. I would not agree with that, your honor. And the reason being is that the FAQ is not clear on that point. All it stated was interest will be paid at 9.5%. It's our weighted average cost of capital. End of discussion. Over the entire period. But it didn't mention or reference anything regarding compounding of interest rates. Yeah. Okay. I see. So, again, the FAQ doesn't help the defendant here because, again, it's a statement of what we expect to do in the future. I think the injury is the minimal initial point of potential accrual. But given the nature of the injury, we use tolling to get us to our expert report. But in either case, this complaint is not subject to dismissal under Rule 12B6. This requires discovery, requires the extent to which the refund payments were made, and whether the nature of the injury was something discernible at that time or did it require an expert's report. But we have a subset, at least, of plaintiffs whose causes of action are viable. They're not barred by the three-year statute of limitations in either case. The district court relied on the Kemper order. And I point out in our brief that the district court's treatment of the Rule 12B6 three-year statute affirmative defense issue is inconsistent with its ruling on the Johnson Act. On the one hand, with the Johnson Act, we are not parties to the case. We were not parties to the Kemper plan proceedings. And therefore, the Johnson Act did not apply. Yet, he's sticking the plaintiffs with the content of that order on that date with the finding that we are all, every rate payer in the state of Mississippi who is entitled to a refund was thereby on notice as of the date of the Kemper order. Those are inconsistent findings. And I think, again, looking at our complaint, we were not parties to the proceeding. We did not have notice of what was going on with the Kemper plan. Therefore, the district court was clearly in error finding that the causes of action accrued on August 6, 2015. So then we have to look to the future. When did the causes of action occur? That a cause of action for a wrongful payment or wrongful or inadequate refund cannot accrue until the date of injury. And that date of injury is not based on a pronouncement of expectation in the future, but when the check comes in the mail. Very simple. And then as we go back to the district court, there will be a process where we decide, determine with Judge Reeves, the extent to which the expert's report creates a tolling, given the nature of the injury, as we decide who's a member of the class and who isn't. That simple. Okay. Thank you, Mr. O'Donnell. Mr. Tompkins had you down for 15 minutes. Is that right? Yes, Your Honor. May it please the court. May it please the court. Jason Tompkins for Appalee Mississippi Power Company. I'm prepared to answer questions about all of the arguments for dismissal, except for the commissioner's sovereign immunity argument, which Mr. Matheny can handle. This case begins and ends with what the plaintiffs actually alleged in their complaint. And they didn't allege a miscalculation based on the rate approved. Rather, their claims as stated in paragraph 30 of the complaint, quote, arise out of the interest calculation method, and specifically that the Mississippi statutory rate was not used. But that interest framework was set by the PSC's order on August 6, 2015. But that's only an injury if it amounts to less, if they would have obtained more under the statutory interest. Right? I mean, you have no injury if, well, they didn't use the Mississippi statutory rate, but we actually got more money than we would have. But the question for accrual of statute of limitations is when circumstances would lead a person to a reasonable person to investigate further. And we know you have to have an injury. And then, and then maybe, I mean, as I understand it, you have to be injured. But then maybe it's a date later than injury. If you needed more time, you wouldn't have realized the injury right away. But I thought the baseline is you do need to be injured. And if they had, if they had inquired the calculations that Mr. Cohen did, their expert to conclude that they were injured could have been done at any point after he knew that the statutory interest rate was not going to be applied. If their claim is that you're applying an interest rate other than what's legally required, then on the date, the PSC said we're applying a different interest rate. They were all noticed to ask if they were injured. And as I understand it, they actually applied on the face, a higher interest rate. It's just that it has to do with this compounding issue is why they say they were underpaid. So I mean, looking at the face of it, isn't the rate that the plan provided the commission provided higher than this statutory rate ultimately appears that way, but they alleged they did not know that number at the time. But what they did know was that it was not the statutory 8% rate. And this is important because one rate payer actually raised that in the PSC proceeding before the order. So it was an issue that people were aware of. And I'm less clear how they didn't know is the statutory rate, at least as the date when the district court said they might have been on notice. It becomes arguably clear under the FAQ. But what aspect of the of the approval put them on notice that wouldn't be the statutory rate? The approval said that interest will be paid at Mississippi Power's weighted average cost of capital, which is different than saying that interest will be paid at Mississippi at the rate specified in Mississippi Code 75-17-1, which again was the specific provision cited by another rate payer to the PSC asking that it be applied. So going back to my question, you don't agree that they only have an injury, right? I mean, you've got elements of a claim. So the element is, oh, they didn't follow the statutory interest rate, but you also have to have an injury and they'd only be injured if they got less than the statute would have allowed them. Or you disagree with that? No, I agree. But Mr. Cohen would have reached the same conclusion they were injured at any time. It didn't take the actual payment for Mr. Cohen to reach those conclusions. In fact, how could he have figured out all the how the interest was compounded versus how it would have been treated under the statute? His conclusion that they were injured wasn't based on that at all. If you look at Record on Appeal, page 48, paragraph 26, he concludes that all rate payers are injured without even knowing the specific amount the Mississippi Power ultimately paid out. Again, this is not a miscalculation issue. This is applying the completely wrong interest framework, according to the plaintiffs. And his ultimate calculations may go to the actual numbers of what Mississippi Power paid out. Based solely on, if you look at the documents he reviewed, based solely on documents dated November 1st, 2015 and earlier, that Mississippi Power was underpaying between 10 and 18 million dollars in interest. And you also must remember that this is a sort of different type of takings claim than the traditional claim where an actor comes and confiscates some property from you. Mississippi Power already had this money, and the question was, were the plaintiffs going to get all of their money back? As soon as that order issued saying that a rate other than the one they thought applied should apply, they had enough facts to request professional advice on whether they were injured. And in fact, as Judge Reeves pointed out, we know that was the case here because plaintiffs actually did seek professional advice at that time in order to assess the import of the refund plan's interest rate. And this is no different than some other contexts that this court has, this and other courts have addressed. We cited in our briefs a tax refund case, General Investments Corporation from the Court of Federal Claims, where the claim for a deficient refund from the IRS for an overpayment by a taxpayer accrued when the IRS decided the amount of the overpayment, not when the payment was actually received. And so it was when the person could ascertain that they were going to get less. From the Fifth Circuit, there's an ERISA case, Fashion v. Sun Life Assurance Company, 931 F. 3rd 412, in which the court held that a claim accrues when a party has enough information that it knows or reasonably should know of the injury or deprivation. And in that case, the beneficiary's claim accrued when it knew that the plan was calculating its employment, its normal salary based on something other than what he thought it should, even without a final denial letter. When is it your position that Mississippi Power gave notice of an interest rate calculation that was not the statutory method? That would be in the refund plan itself, filed with the Public Service Commission on July 21st, 2015. The commission's approved plan, that's when you say? Well, it was, so Mississippi, two things, I suppose. First, in the order on remand when the case came back from the Mississippi Supreme Court, the PSC actually entered an order directing Mississippi Power to submit a refund plan and stated in that order that it should include interest at the weighted average cost of capital. Mississippi Power, two weeks later, submitted the actual refund plan where it proposed calculating interest in that way pursuant to that order. And then on August 6th, 2015, the commission accepted that refund plan. And it was at that time that the rights were carved in stone. It's at that time that the plaintiffs had enough facts to ask, am I going to get the amount of money that I think I'm entitled to pursuing? And the November 1st FAQ is identical to that? The November 1st FAQ actually calculated the number, the 9.5%, what the weighted average cost of capital was. But that's a calculation that Mr. Cohen certainly could have done earlier. We set it forth in footnote 10 of our brief, the way that that could be calculated from available documents. But again, it's our position that the actual rate doesn't matter for purposes of inquiry notice because if their claim is it had to be the Mississippi Code rate, that they knew that was not going to be used on August 6th, 2015 at the latest. And at that point, they could have engaged Mr. Cohen. And in fact, at some point they did engage Mr. Cohen. And it's always been their position to go back to something you said, Judge Higginson, on the appellant's argument. I don't believe that they actually argued that the date of receipt of may be because of Judge Costa's point about that spans both sides of the date to actually file the complaint. So it really creates class certification issues for them if that's the date. So they've always advanced. Just on that, because a couple of dates have been thrown out. The FAQ says November 7, opposing counsel said November 9. When did the first check get issued? I believe November 9. I don't have that right in front of me now. But I think that it was interest through November 7 with checks issuing November 9. I see. I'm going on recollection there. But I think that was it. But whether I'm right about the November 7 date, I do believe that it was November 9 through December 4 that checks were mailed out. But again, that's not a position that the appellants have advanced until now. The position they had in the district court was that it's when they receive the advice of their expert. And that position simply has no limiting principle whatsoever and puts accrual of a statute of limitations completely within the volitional act of a plaintiff. And they could have waited, as Judge Costa pointed out, a decade, or it could have taken them a decade. But it's completely within their control at that point. And that's simply not the policies that the statute of limitations seek to uphold here. Speaking of policies of the statute of limitations, one is to give the plaintiffs time to investigate their claims. And that's exactly the purpose that was served here. They had notice to ask questions as early as July 2015, but certainly by August 2015. And they asked those questions, and they had an expert tell them, you were injured by this commission order. But as Judge Reeves said, unfortunately, they did not make use of that advice for more than 10 years. So this wasn't a close call. They had the opportunity to assert their rights, and they simply slept on it. No one wants to talk about the Johnson Act? I'm happy to talk about the Johnson Act if you would like, Your Honor. Yeah, I mean, does it all really come down to this notice and whether it's two commission orders or treated as a single commission proceeding? Yes, Your Honor, I believe it does. And it is one commission proceeding. It all proceeds under the notices in the record. And that is at ROA 545 through 550. This was a notice that was sent out to all ratepayers in their monthly bill about the increased rates from the Kemper Project. And this was not a notice that was addressed in the Mississippi Supreme Court decision. That this was a notice that occurred after that on February 11, 2013. In addition to that individual notice, there was publication in several newspapers. There was a public notice from the Public Service Commission. All the notices at that time in February 2013 were done pursuant to the Mississippi Code's notice requirements. And our position is that's per se reasonable. The Alabama Supreme Court actually had a great way of defining due process. And they said, quote, notice is it constitutes notice reasonably calculated under all the circumstances to apprise interested parties of dependency of the action and afford them an opportunity to present their objection, end quote. So when all ratepayers received notice in February 2013, that there was a proceeding to increase their rates by a significant amount, they were on notice of dependency of that action. And when that case ultimately went to the Mississippi Supreme Court, resulting in a published decision, and then back down to the same proceeding, they still had the opportunity to attempt to intervene in those proceedings. The commission has intervention rules and ratepayers have standing to intervene. They did not take advantage of that. Some ratepayers did, and some raised the precise issue with a statutory interest that we have here. But that's no different than the more common situation that we pointed out in our brief with the federal rules of civil procedure. Initial notice is always much more stringent than any subsequent notice required because you want to make sure someone has notice of dependency of the action. And if they choose not to assert any rights in that action, that's not a failure of the law, but a failure on their part. It's also similar to class notices and class actions. Someone may get notice of their right to object if they choose not to intervene and assert any rights. That's no different. They had notice of dependency of the proceeding and the refund stage that we're talking about now occurred in that same proceeding for which they had all the statutory notice due to them. If there's no jurisdiction, I guess you lose your dismissal on the merits. And then when it should be a state court action, you'd start all over in state court, I guess would be a limitations issue there. Yes, your honor, I believe you rule for us on the Johnson Act, you would vacate the district court's opinion and the plaintiffs could choose how and where they would like to proceed. I see my time has expired, so I would just ask that the court affirm Judge Reeves' opinion either on the statute of limitations or one of the alternative grounds that we've argued. Okay, thank you, sir. Mr. Matheny, you're next. Good afternoon. May it please the court, Justin Matheny for the Mississippi Public Service Commissioner Defendants. I'd like to make three points about sovereign immunity. Ex parte Young lacks any application here, first of all. The relief to plaintiff's demand against the commissioners reopened the commission's past long since completed proceeding on the Kemper refund plan and require the district court to retroactively re-adjudicate that state proceeding, and this is obviously beyond the scope of ex parte Young. There's no ongoing violation of federal law here. Plaintiffs don't even allege that there is. The complaint admits that the refund program is over at page 404 of their complaint and again at page 8 of their brief here on the appeal. The plaintiff's claims against the commissioners would have the district court adjudicate a past liability and the relief would be entirely retrospective. Now, plaintiffs nominally label their relief as prospective, but it is not. They demand relief in validating the commission order governing the long since completed refund plan and an injunction obligating the commissioners to turn back the clock and order Mississippi Power to execute a different refund plan using a different interest rate methodology. That, in no sense whatsoever, is relief properly characterized as prospective. To my second point, no authority supports the plaintiff's position, and that's why their briefing essentially offers no response to commissioners' immunity argument or Judge Reif's ruling on it. It wasn't even mentioned earlier today. This case is a purely past act case, not a case against state public utility commissions involving ongoing and future conduct where ex parte Young was satisfied. Verizon Maryland, which was cited in the plaintiff's briefs, involved federal preemption of commission orders that govern the carriers' past and future and present reciprocal compensation transactions. The state commission was allegedly violating federal law presently by virtue of present enforcement of its orders, and it allegedly would be violating federal law in the future by continuing to enforce the orders. But the commission here isn't even allegedly presently enforcing any orders regarding the Kemper refund plan, nor is it even alleged that it will do so in the future. This court's decision in Green Valley Utility District involved preemption claims against the state commission's future decertification or encroachment of service areas. The commission's present and future enforcement of orders decertifying the service area was the alleged ongoing violation of federal law there, and the requested relief that would have prohibited that violation in the future was something that the court allowed to go forward under ex parte Young. But this case is nothing like that. The commission's actions and enforcement of the Kemper refund plan are long since past and will never recur again in the future. I would also say the plaintiff cited in their reply brief to the severance case, this case is certainly not like the severance case. In severance, what you had there was a rolling beachfront easement that Texas and Texas had a dispute with the beachfront property owner, but severance didn't even involve or analyze ex parte Young. Texas's sovereign immunity argument was that it equated to a quiet title dispute that would have allowed for the sovereign immunity to apply under Idaho versus Coeur d'Alene. This is a dispute about a refund program that ended nearly six years ago, not a dispute over present and future easement enforcement. My last point is this. The plaintiff's ex parte theory can't be correct, and its implications are problematic. Here's why. If they are correct, anybody could try to make a federal due process or takings case out of every prejudgment interest or interest decision or even a damages award made by Mississippi State Court or agency regulators under state law. Then they could drag the judges or the agency regulators into federal court to go back in the past to re-litigate it. The Tenth Circuit rejected that approach to revisiting past orders in state courts in the Bookheight decision cited in our brief. The Second Circuit rejected it in Caruso. I believe this court rejected that theory in Green Valley as to the retrospective relief. And so I would say this to sum up. Mississippi sovereign's immunity bars the plaintiff's approach. The ex parte Young doctrine doesn't exist to empower federal courts to take their approach. And that's exactly why the district court correctly dismissed the dismissions from this lawsuit and its decision should be affirmed. If there are no further questions, I'd ask the Thank you, Mr. O'Donnell. You have your time on about five minutes. Thank you, Your Honor. Number one, the case cited by Mississippi Power Company's attorney, the IRS case citing this issue about injury actually supports our position. That case turned ultimately on an IRS regulation. But within that decision, as we point out in our reply brief, the court noted the federal common law rule in a case very analogous to ours. And that is, that was a wrongful refund case. And the court cited the common law rule with approval didn't apply it because an IRS regulation applied instead, that the cause of action accrues, when all of the events which fix the government's alleged liability have occurred. And the plaintiff was or should have been aware of the existence of that injury. And that's the rule we're espousing here. In spite of all of the pronouncements that the power companies relying on in terms of what they expected to do or what the plan expected to have happened, cause of action simply does not accrue until the injury occurs. I can't sue my neighbor, my neighbor comes over the fence and says, by the way, next Tuesday, I'm going to steal your television set and I'm going to do it by coming in through your front door. That doesn't give me a cause of action for theft. I have to wait for the theft to occur before I can sue him for stealing my TV set. Same thought here. Now, this issue about notice in the prior proceeding, the Blanton case that ultimately resulted in the Supreme Court reversing the rate order and requiring the refund, simply because the rate payers were given a notice of the original rate proceeding, which occurred prior to the Supreme Court rendering its decision in the Blanton case, does not serve, number one, to make us parties to the case as rate payers. And certainly didn't get notice that there was a refund in the offing. And here is the date of the proceeding. You are welcome to attend. There's nothing in the record to that effect. And Judge Reeves was correct that the record, in terms of the pleadings and the other elements that the power company added, because it was a Rule 12b1 motion, that nothing established what notice, if any, was given to the rate payers with regard to the refund proceedings and ultimately the issuance of the Kemper refund plan. Nothing. They cannot rely on the notice that was given during the original proceedings predating the Blanton Supreme Court decision. Unreasonable to conclude that a rate payer would thereby be on notice of all subsequent proceedings, if any, and that they had an obligation to keep up with the docket. Only parties have that obligation. There are other ways for them to do that by way of giving notice, just as they did the original proceeding, mail outs to everybody. They did not do that with the Kemper proceeding, with the refund. In your brief, you clearly say that you were sufficiently on notice of an injury as of date of receipt or expert's report. But just clarify below, to the district court, did you likewise argue that at least as of date of receipt? I believe that argument's made. I think it's also related in the complaint, First Amendment complaint, that the court could not have occurred, well, the earliest would have to be the date of injury. That is the date of receipt. That was giving the power company all the benefit of the doubt in terms of the allegations of the complaint and what theory would ultimately hold with regard to the accrual of the cause of action. But we've always taken the position that, in spite of the injury, that the accrual did not occur until our expert made known of the injury. But the commission had approved back in August and specifically said 7% is fine. You will not get Mississippi State interest amount. Your argument would be that that is not sufficient knowledge of critical facts of injury? That's knowledge of a potential injury in the future, but it's not the injury. You know, the totaling rules, the newer should have known, they all speak in terms of present- I thought that the law was fairly clear. It's not actual injury. It's when you have sufficient critical facts of an injury. Of an injury. An injury has to occur. Either you knew at the time of the injury or you should have known at the time of the injury. You take the position that, I mean, as I- Or at some later date. I mean, that usually comes up in mass torts where, oh, I was exposed to asbestos and, you know, in 1995, I didn't know I had asbestosis, but I should have known three years later when, you know, I was really sick. I mean, that's right. That's how that should have known typically arises that way. That's right. It's not exposure. That's correct, Your Honor. Again, a lay person is not expected to know of the injury. They don't have the expertise to understand. They don't have the expertise to understand what a weighted average cost of capital is. And the Eppley brief, I think it's number nine, they go through this convoluted gyration of computation. Well, any person could get on the World Wide Web and figure this out or go on to the docket in an XYZ case and look at- pull this report and pull that report and then you make XYZ calculations and voila, you get the 9.5% interest rate. A lay person is not expected to do that. That's not notice. And if it is notice, it's simply still not injury. The- as the original IRS cases talk about, you know, the entity could change his mind. It could seek a revision. The plant- the power- the NPC has the right to change its order. It didn't choose to do so, but lots of things could happen before the checks are actually issued. But as, again, our expert points out, even the 9.5% simple interest rate calculation, based on the information that he had and based on the expressions that the power company had in its FAQ where it said that we expect to pay $30 million in interest, he said, if that's true, he said, I don't know if that's true. I'll need to know what was actually paid. And the checks hadn't been sent out yet, but if that's true, that does not comport with 9.5%. So either way you go, if you look at his report, he says the plans have been underpaid. Either legal rate of interest. So I guess I'm done. I appreciate the court's attention. Okay. Thank you, sir. We'll be submitting all the other cases we've argued today, be submitted, and this panel will, after our conference today, will adjourn and sign it up.